# AFFIDAVIT OF SPECIAL AGENT ADAM BOYNTON IN SUPPORT OF COMPLAINT AND APPLICATION FOR A SEIZURE WARRANT

I, Adam Boynton, having been first duly sworn, do hereby depose and state as follows:

## *INTRODUCTION AND AGENT BACKGROUND*

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed for eleven years. Since April 2010, I have been assigned to the Boston Division. I am currently assigned to the Lowell Resident Agency in Lowell, Massachusetts, where my primary duty is the investigation of criminal matters, including but not limited to financial crimes, drug and gang investigations, and violent crimes against children. Prior to my current assignment, I was assigned to the Boston Division's Gang Unit and Counter Terrorism Unit.

2. I am currently investigating Dana L. McIntyre ("McIntyre") for various crimes, including wire fraud, in violation of Title 18, United States Code, Section 1343; false statements to a financial institution, in violation of Title 18, United States Code, Section 1014; and money laundering, in violation of Title 18, United States Code, Section 1957.

3. This affidavit is being submitted in support of a criminal complaint charging McIntyre with wire fraud and money laundering in connection with the submission of a fraudulent loan application and subsequent transactions with the fraudulently obtained loan proceeds.

4. In addition, I submit this affidavit in support of applications for a seizure warrants for the following property:

   a. Up to $209,500 held by Brattleboro Savings & Loan in, or on behalf of, checking account number 500714614 in the name of "Triple D Family Trust" (the "Brattleboro 4614 Account");

   b. A black 2007 GMC Sierra, with VIN 1GTHK24UX7E194863, registered to Dana McIntyre (the "2007 GMC Sierra"); and

   c. A classic 1950 Hudson automobile with VIN 50034215, registered to Dana McIntyre (the "1950 Hudson")

(collectively, the "Property").

5. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses.

6. This affidavit does not set forth all of the facts developed during the course of this investigation and does not set forth all of my knowledge about this matter. It is intended to show that there is probable cause to believe that McIntyre has committed the above-described offenses and that the funds in the Brattleboro 4614 Account are subject to forfeiture because they represent proceeds traceable to the offenses set forth above.

## *PROBABLE CAUSE TO BELIEVE THAT FEDERAL CRIMES WERE COMMITTED*

### *Overview of Federal COVID-19 Relief Programs*

7. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to millions of Americans suffering the economic effects of the COVID-19 pandemic.

8. As part of the CARES Act, the United States Congress initially authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized more than $300 billion in additional PPP funding.

9. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application signed by an authorized representative of the business. The PPP loan application requires the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications. In the PPP loan application, the small business, through its authorized representative, must state, among other things, its (i) number of employees and (ii) average monthly payroll expenses. These figures are used to calculate the amount of a PPP loan

the business is eligible to receive. In addition, businesses applying for a PPP loan must provide documentation of their payroll expenses.

10.     A PPP loan application must be processed by an authorized Small Business Administration ("SBA") lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100 percent guaranteed by the SBA. Data from the application, including information about the borrower, the total loan amount, and the listed number of employees, are transmitted by the lender to the SBA in the course of processing the loan.

11.     PPP loan proceeds must be used by the business on certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these permissible expenses within a designated period of time and uses a certain percentage of the PPP loan proceeds on payroll expenses.

12.     The CARES Act also expanded the SBA's Economic Injury Disaster Loan (EIDL) program to provide loans of up to $2 million to small businesses and other eligible entities affected by the pandemic, in conjunction with the United States Government's declaration of a COVID-19 disaster. The CARES Act temporarily modified eligibility for the EIDL program to assist business entities that suffered "substantial economic injury" from COVID-19. The EIDL program requires businesses receiving funds to use the funds only on certain permissible business expenses, such as payments of fixed business debts, payroll accounts payable, and other business-related expenses that the business could have paid had the COVID-19 disaster not occurred.

13.     EIDL funds are issued directly from the United States Treasury. Applicants apply through the SBA via an online portal and application. The EIDL loan application process requires

applicants to provide information concerning the affected business, including the ownership of the business, the number of employees, and gross revenues and costs of goods sold in the 12 months prior to January 31, 2020. Applicants electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

14. The SBA relies upon the information provided by the applicant to calculate how much money the small business is eligible to receive in the form of an EIDL loan. Additionally, by checking a box in the online EIDL application, an applicant may request and receive up to $10,000 in an EIDL Cash Advance Grant based on the number of employees claimed in the application ($1,000 per employee). The applicant is not required to repay an EIDL Cash Advance Grant, even if (i) the SBA ultimately denies the EIDL loan application or (ii) the applicant declines the EIDL loan offered by the SBA at a later date.

*Relevant Individual and Entities*

15. McIntyre is a resident of Essex, Massachusetts and Grafton, Vermont. Between in or about 2015 and in or about August 2020, McIntyre owned and operated Rasta Foods, Inc., doing business as Rasta Pasta Pizzeria ("Rasta"), a restaurant in Beverly, Massachusetts.

16. Rasta is a Massachusetts corporation that was registered with the Massachusetts Secretary of the Commonwealth on or about November 3, 2015, with McIntyre as its president. Rasta was dissolved as a registered entity on or about June 28, 2019.

17. Marley's Pizza, Inc. ("Marley's") is a Massachusetts corporation that was registered with the Massachusetts Secretary of the Commonwealth on or about February 14, 2020.

McIntyre's son is listed in corporate records as the president, sole officer, and registered agent of Marley's.[1]

18. Kabbage, Inc. ("Kabbage") is a financial technology company and an SBA-approved lender of PPP loans.[2]

### *Overview of the Scheme*

19. Between approximately March and May 2020, McIntyre submitted at least four applications for CARES Act relief funds, via wire communications in interstate commerce. As set forth below, McIntyre submitted a PPP application to Kabbage seeking a loan of $661,615 (the "PPP Application"), in addition to submitting three EIDL applications seeking loans in smaller amounts. The PPP Application was approved, and Kabbage disbursed the PPP loan funds to Rasta (the "PPP Funds").

20. As outlined below, the PPP Application and supporting documentation contained representations inconsistent with both the information McIntyre provided in a previous EIDL loan application for Rasta and with Rasta's actual business activity. Based on my training and experience in financial fraud investigations, I believe these inconsistencies indicate that McIntyre fraudulently inflated information about Rasta's employees and payroll expenses and falsified an official tax form in order to obtain the PPP Funds.

21. After receiving the PPP Funds, McIntyre used nearly all of the PPP Funds for personal expenses unrelated to Rasta. For example, McIntyre placed PPP Funds into a family trust

---

[1] Based on my knowledge of the investigation, I believe that McIntyre registered the Marley's entity and named his son as an officer without his son's involvement. Rasta bank statements indicate that McIntyre's son intermittently received paychecks from Rasta in 2019 and 2020.

[2] American Express acquired Kabbage in or about October 2020.

and used the money to purchase and upgrade a farm in Vermont, where he has resided since selling Rasta in or around August 2020. McIntyre also used PPP Funds to purchase two vehicles, several alpaca, and weekly airtime for a cryptocurrency-themed radio show, among other expenses.

### *The EIDL Applications*

22. As set forth below, McIntyre submitted three EIDL loan applications to the SBA on or about March 31, 2020, shortly after EIDL funds became available under the CARES Act.

A. The Marley's Application

23. McIntyre submitted an application on behalf of Marley's for an EIDL loan in the amount of approximately $150,000 (the "Marley's Application"). On the Marley's Application, McIntyre indicated that Marley's operated under the trade name "Rasta Pasta Pizzeria" at 407 Cabot Street, in Beverly, Massachusetts, which is Rasta's address.[3]

24. McIntyre indicated on the application that he was the chief executive officer ("CEO") and sole owner of Marley's and provided his own contact information.[4] Although McIntyre had operated Rasta as early as 2015, McIntyre listed the "business open date" and "ownership start date" for Marley's as "01/01/2019."

25. McIntyre indicated on the application that Marley's had six employees and gross revenues of $545,679 for the 12 months prior to January 31, 2020 (an average of $45,473 in monthly sales).

26. Upon submitting the Marley's Application online, McIntyre checked a box next to the statement, "I would like to be considered for an advance of up to $10,000." On or about April

---

[3] McIntyre provided a Tax Identification Number (TIN) for Marley's that was different from Rasta's TIN.

[4] McIntyre did not reference his son in the Marley's Application.

21, 2020, the SBA disbursed an EIDL Cash Advance Grant of $6,000 to Rasta's payroll account at NorthEast Community Bank ("NorthEast") ($1,000 per each of the six employees McIntyre claimed).

27. McIntyre did not pursue the Marley's Application further after he subsequently obtained the PPP Funds for Rasta. On or about July 20, 2020, the SBA informed McIntyre by letter that, "due to inactivity, we have withdrawn your application from active consideration."

B. Other EIDL Applications

28. McIntyre also submitted two EIDL applications on behalf of businesses that appear to be fictitious entities named after his children.

29. First, McIntyre submitted an application in the name of his daughter, doing business as "Dana's Dank Pies," for an EIDL loan in the amount of $15,500. Public records indicate that McIntyre's daughter resides in California. McIntyre identified Dana's Dank Pies as a service retail business located at 18R Country Road in Essex, Massachusetts, which was McIntyre's home address. McIntyre claimed that Dana's Dank Pies had two employees and gross revenues of $38,900 for the 12 months prior to January 31, 2020. McIntyre provided the routing information for Rasta's payroll account on this application.

30. Second, McIntyre submitted an application in his son's name, doing business as "[Son] Entertainment," for an EIDL loan in the amount of $36,300. McIntyre identified the applicant as an "entertainment services" business, and provided his home address—the same address he had listed on the application for Dana's Dank Pies—as the company's purported business address. McIntyre claimed that the business had two employees and gross revenues of $112,332 for the 12 months prior to January 31, 2020.

31. On both applications, McIntyre listed his son or daughter as sole owner of the businesses and provided their Social Security numbers and dates of birth. However, on both applications, McIntyre provided his own telephone number, email address, and physical address.

32. My review of public records located no business operating under the name Dana's Dank Pies or [Son] Entertainment. "Dana's Dank Pie" was the name of a specialty pizza on Rasta's menu.

33. The SBA denied both loan applications, including requests for EIDL Cash Advance Grants. SBA records indicate that the agency determined that the application on behalf of Dana's Dank Pies was a "duplicate" of the Marley's Application on April 20, 2020, and that it declined the application for [Son] Entertainment on August 17, 2020 after it could not verify information about the business.

### *The PPP Application*

34. McIntyre submitted the PPP Application to Kabbage on or about April 30, 2020, seeking a loan in the amount of $661,615.

35. McIntyre identified Rasta as a C-Corporation located at 407 Cabot Street in Beverly, Massachusetts, which was the same address that he provided on the Marley's Application. McIntyre electronically signed the PPP Application as president of Rasta and certified that he did not own any other business or have common management with any other business.[5]

---

[5] The "Paycheck Protection Program Borrower Application Form" requires all applicants to provide basic information about the applying business's operations and payroll. All applicants must answer a series of questions in order to confirm they qualify for a PPP loan. One of the questions asks, "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A."

36. On the PPP Application, McIntyre claimed that Rasta Foods had 47 employees, and an average monthly payroll of $264,646. He identified the "purpose[s] of the loan" as "payroll" and "utilities."

37. In support of the payroll calculation on the PPP Application, McIntyre submitted an IRS Form W-3 (Transmittal of Wage and Tax Statements), which summarizes employee wages and withholdings for the previous year.[6] The IRS Form W-3 that McIntyre provided to Kabbage purported to show that Rasta reported to the IRS having 47 employees and paying $1,584,877.46 in wages, tips, and other compensation in 2019. McIntyre signed the IRS Form W-3 as president of Rasta and dated the form December 18, 2019.

38. Kabbage notified McIntyre that the PPP Application had been approved on or about May 1, 2020 and disbursed $661,615 to Rasta's payroll account on or about May 7, 2020.

*Misrepresentations in the PPP Application*

39. Based on my training and experience, my review of records in this case, and the inconsistencies between the Marley's Application and the PPP Application, I believe that McIntyre made materially false representations to Kabbage in order to obtain the PPP Funds.

40. As set forth above, McIntyre submitted two CARES Act loan applications on behalf of the same business, Rasta. On these applications, McIntyre reported different information concerning the number of Rasta's employees and Rasta's average monthly payroll. On the Marley's Application, McIntyre claimed to have six employees and sales averaging approximately $45,000 each month. However, on the PPP Application, McIntyre claimed that Rasta had 47

---

[6] Employers are required to submit IRS Form W-3 to the Social Security Administration ("SSA") along with employees' IRS Forms W-2 (Wage and Tax Statement), after the conclusion of the business's calendar year. Information reported on IRS Form W-3 must be consistent with information reported on all IRS Forms 941 (Employer's Quarterly Federal Tax Return).

9

employees—almost eight times as many as reported on the Marley's Application—and average monthly payroll expenses of approximately $265,000—around six times as much as the monthly sales estimate from the Marley's Application.

41. I reviewed the IRS Form W-3 that McIntyre submitted with the PPP Application. Based on my training and experience, I understand that employers typically do not submit this form to the SSA until after the end of the applicable tax year. The IRS Form W-3 for 2019 that McIntyre provided to Kabbage is dated December 18, 2019. Additionally, McIntyre filed no personal federal income tax return (IRS Form 1040), U.S. Corporation Income Tax Return (IRS Form 1120), Federal Employer's Unemployment Tax Return (IRS Form 940), or Employer's Quarterly Federal Tax Return (IRS Form 941) with the IRS for tax year 2019. Based on my training and experience, and information provided by other agents involved in this case, I understand that it is highly uncommon for an employer to file an IRS Form W-3 with the SSA but not to file these other tax and wage forms with the IRS. Based on these facts, as well as records I reviewed relating to Rasta's payroll expenses for 2019, I believe that McIntyre falsified the IRS Form W-3 that he provided to Kabbage.

42. I also reviewed bank statements and other business records indicating that, at all times leading up to and after McIntyre's submission of the PPP Application, Rasta employed far fewer than 47 employees and paid significantly lower monthly payroll expenses than the amounts that McIntyre reported to Kabbage on the PPP Application.

43. For example, I reviewed NorthEast bank statements for Rasta's operating and payroll accounts for 2019 and 2020. In 2019, Rasta paid from these accounts a total of approximately $28,041 in wages to nine individuals, or an average of $2,337 each month.[7]

---

[7] These estimates include any payment to an individual (excluding McIntyre) that did not

44.     Between January 1, 2020 and McIntyre's receipt of the PPP Funds on May 7, 2020, Rasta paid three individuals a total of approximately $16,658 in wages, or an average of approximately $4,165 each month.

45.     Between Rasta's receipt of the PPP Funds on May 7, 2020 and December 31, 2020, Rasta paid six individuals a total of approximately $43,785 in wages, or an average of $10,946 for each of the four months for which McIntyre continued to operate Rasta. Rasta paid at least $19,000 of that amount to one employee ("Employee 1").[8] In addition to weekly paychecks, Employee 1 received three larger payments from Rasta's payroll account between May and June 2020 totaling $11,480. Employee 1 continued to receive weekly payments from Rasta's payroll account after McIntyre's sale of Rasta in or around August 2020.[9]

46.     I also reviewed records of McIntyre's Venmo accounts.[10] Between January 2019 and August 2020, McIntyre transferred via Venmo a total of $16,915 to an individual who appears to have worked at Rasta, but who was not issued checks from Rasta's payroll account. Venmo records otherwise reflect no substantial transfers resembling wages to employees.

---

appear clearly to be for a purpose other than payment of wages.

[8] Employee 1's LinkedIn profile stated that she was "Office Manager" and "Back of House Supervisor" at Rasta, as well as the owner of a separate retail business. Public records indicate that McIntyre registered two vehicles at Employee 1's residential address. Call detail records and bank statements reflect that McIntyre's cell phone is part of Employee 1's AT&T phone plan.

[9] Rasta's payroll account statements additionally reflect that, between August and November 2020, Rasta made four monthly payments, totaling $1,600, with the description "6 Dock Square #4." This address was the location of Employee 1's retail business in Rockport, Massachusetts at the time.

[10] Venmo is a mobile payment service owned by PayPal that allows account holders to transfer funds to others via a mobile phone application.

47. McIntyre did not file a personal federal income tax return or any business tax return for 2019. I reviewed the tax filings that McIntyre submitted to the IRS for 2018. On his Schedule C (Profit or Loss from Business) to IRS Form 1040 (U.S. Individual Income Tax Return), McIntyre claimed wage expenses of $38,898 for the entire year 2018. On his IRS Form 940 for 2018 (Employer's Annual Federal Unemployment (FUTA) Tax Return), McIntyre claimed total payments to all employees of $64,782.40 for the year. McIntyre filed IRS Form 941 (Employer's Quarterly Federal Tax Return) for three out of four quarters of 2018; in these three filings, McIntyre reported a total of $51,478.06 in wages, tips, and other compensation paid to employees.

48. Further, I reviewed records relating to Rasta's current and former worker's compensation insurance coverage. Insurance records obtained by the Massachusetts Insurance Fraud Bureau indicate that Rasta did not have worker's compensation insurance coverage for any part of 2019. McIntyre obtained a worker's compensation policy under the name Marley's, doing business as Rasta, from The Hartford, an insurance company, in or around February 2020. The Hartford's records indicate that McIntyre claimed that Marley's had only two employees and $50,000 in estimated annual payroll on his application for a worker's compensation policy.

49. Finally, I reviewed records from the Massachusetts Department of Unemployment Assistance ("DUA") with respect to quarterly wage reports made by Rasta to the DUA.[11] For 2018, Rasta reported wages paid to 15 individuals, totaling approximately $51,500 for the entire year. According to DUA, McIntyre made no quarterly wage reports for 2019 or 2020.

---

[11] Massachusetts law requires an employer to submit employment and wage detail reports to DUA on a quarterly basis for the purpose of calculating the employer's required unemployment insurance, employer medical assistance, and workforce training fund contributions.

50. In sum, I am aware of no financial records that support McIntyre's claim on the PPP Application that Rasta had 47 employees and monthly payroll expenses of approximately $265,000.

51. The employee and payroll information McIntyre reported to other sources, as well as the wages that McIntyre appears to have actually paid, would have qualified Rasta for only a far smaller PPP loan than the one Rasta received as a result of the PPP Application.

52. Based on the considerable differences between the information McIntyre reported on the PPP Application and information about Rasta from business and government records, as well as the absence of any records supporting the number of employees and monthly expenditures that McIntyre claimed on the PPP Application, I submit that there is probable cause to believe that McIntyre fraudulently misrepresented employee and payroll information on the PPP Application and falsified supporting documentation in order to obtain a PPP loan larger than one for which he would otherwise have legitimately been eligible.

### *Laundering of the PPP Funds*

53. Kabbage deposited $661,615 in PPP Funds to Rasta's payroll account on or about May 7, 2020. Prior to this deposit, Rasta's payroll account had a balance of $2,506.82. Bank statements and public records indicate that McIntyre used nearly all of the fraudulently obtained PPP Funds for personal expenses unrelated to Rasta.

54. Between May 7 and June 22, 2020, no other deposits were made to Rasta's payroll account. On or about June 12, 2020, McIntyre transferred $40,000 from Rasta's payroll account to his personal bank account at NorthEast. Days later, on or about June 16, 2020, McIntyre issued a check for $39,5000 with the description "Deposit" from his personal account to a Vermont real estate company.

55. On or about June 22, 2020, McIntyre issued a check in the amount of $575,000 from Rasta's payroll account to the client account of a Vermont law firm (the "Client Account").

56. Public records indicate that, on or about July 31, 2020, a "Triple D Family Trust"[12] administered by the Vermont law firm purchased a farm at 366 Houghtonville Road in Grafton, Vermont for $395,000. I reviewed bank statements for the Client Account. On or about July 31, 2020, the Vermont law firm made several payments from the Client Account, totaling around $361,000, that appear related to the purchase of 366 Houghtonville Road.

57. In or about August 2020, McIntyre paid $16,555 to a Vermont company that sells storage structures and $4,772 to a Vermont grounds maintenance consultant, in each case using funds from Rasta's payroll account.

58. On or about September 10, 2020, the Vermont law firm issued a check in the amount of $209,500 from the Client Account to Triple D Family Trust. McIntyre applied to open the Brattleboro 4614 Account on or about September 17, 2020 and signed the Account Agreement for the Brattleboro 4614 Account on or about October 1, 2020 as the sole signatory on the account. The funds from the Client Account were deposited into the Brattleboro 4614 Account on or about October 1, 2020.

59. McIntyre subsequently used funds from the Brattleboro 4614 Account to pay various expenses, including the following:

   a) Two payments totaling $6,380, along with one payment of $3,400 from Rasta's payroll account, to an alpaca farm in Vermont between September and December 2020;

---

[12] The first names of McIntyre, his son, and his daughter all begin with the letter "D."

b) $14,000 to acquire the 2007 GMC Sierra in October 2020 and for additional vehicle registration costs;

c) $7,762 to a New Hampshire fence systems company in October 2020;

d) Seven payments totaling $6,500 between October and December 2020 to WBOQ ("North Shore 104.9"), the radio station that broadcasts "The Dana Crypto Show," a Saturday evening, cryptocurrency-themed radio show that McIntyre hosts;

e) $5,850 to a home construction company in Vermont between October and November 2020;

f) $8,500 to acquire the 1950 Hudson, in October 2020;

g) An additional $4,000 to the Vermont grounds maintenance consultant in November 2020;

h) $3,000 to a Massachusetts kitchen remodeling company in December 2020;

i) Approximately $5,000 at the Home Depot between December 2020 and January 2021;

j) $2,200 to a Massachusetts cosmetic spa in February 2021; and

k) $6,218 in property taxes to the Town of Grafton between October 2020 and February 2021.

60.     On or about January 24, 2021, McIntyre registered "Houghtonville Farm, LLC" with the Vermont Secretary of State.  As early as January 26, 2021, Houghtonville Farm launched a website (houghtonvillefarm.com) calling the business "the best little alpaca farm in Vermont" and advertising alpaca products, as well as cannabidiol products from Employee 1's business.

61.     Based on McIntyre's movement of $40,000 and $575,000 of fraudulently obtained PPP Funds, as well as his subsequent transfer of $209,500 of those funds, for the purchase of 366

Houghtonville Road and other expenses unrelated to Rasta, I submit that there is probable cause to believe that McIntyre knowingly engaged in monetary transactions in criminally derived funds.

### PROBABLE CAUSE FOR SEIZURE WARRANTS

62. A review of available bank records for Rasta's payroll account, the Client Account, and the Brattleboro 4614 Account reveals the following transaction history.

63. On or about May 7, 2020, a $661,615 deposit was made into Rasta's payroll account from Kabbage as a result of McIntyre's submission of the PPP Application. As set forth above, there is probable cause to believe that this $661,615 deposit represents proceeds traceable to wire fraud, in violation of Title 18, United States Code, Section 1343.

64. As noted above, prior to this deposit, Rasta's payroll account had a balance of $2,506.82, and no other deposits were made to Rasta's payroll account between May 7 and June 22, 2020, although McIntyre made a number of withdrawals, including $40,000 that McIntyre used to pay the deposit on 366 Houghtonville Road.

65. On or about June 22, 2020, McIntyre transferred $575,000 from Rasta's payroll account to the Client Account. The Vermont law firm subsequently used approximately $361,000 of that amount to purchase 366 Houghtonville Road on behalf of Triple D Family Trust.

66. Of the amount from Rasta remaining in the Client Account, a check was issued for $209,500 and deposited into the newly opened Brattleboro 4614 Account on or about October 1, 2020. Prior to this deposit, the Brattleboro 4614 Account had a zero balance.

67. As of February 26, 2021, only two other deposits, totaling $3,664.80, have been made to the Brattleboro 4614 Account.

68. Based on the foregoing, I submit that probable cause exists to believe that up to $209,500 in the Brattleboro 4614 Account represents proceeds from wire fraud and is subject to

forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section § 2461(c), as "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Pursuant to Title 18, United States Code, Section 1956(c)(7)(A), incorporating Title 18 United States Code, Section 1961(1), specified unlawful activity includes wire fraud in violation of Title 18, United States Code, Section 1343.

69. I further submit that probable cause exists to believe that up to $209,500 in the Brattleboro 4614 Account is subject to forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1), as "any property, real or personal, involved in [an offense in violation of Title 18, United States Code, Section 1957 (engaging in monetary transaction in property derived from specified unlawful activity)], or any property traceable to such property." Based on evidence gathered during the investigation, there is probable cause to believe that the deposit of $209,500 into the Brattleboro 4614 Account is a monetary transaction in criminally derived property from a specified unlawful activity greater than $10,000 in violation of Title 18, United States Code, Section 1957(a).

70. In addition, pursuant to Title 18, United States Code, Section 984(b), the government is entitled to forfeit any funds in an account to which illegal proceeds were deposited within the last year without tracing those funds directly to the offense, even if the other deposited funds may not be illegal proceeds.

71. Shortly after depositing the fraud proceeds into the Brattleboro 4614 Account, as described above, in October 2020 McIntyre withdrew funds from that account to purchase two

vehicles: the 2007 GMC Sierra and the 1950 Hunsdon, for approximately $14,000 and $8,500 respectively.

72.     I submit that probable cause exists to believe that the 2007 GMC Sierra and the 1950 Hudson are subject to forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1), as property traceable to "any property, real or personal, involved in [an offense in violation of Title 18, United States Code, Section 1957 (engaging in monetary transaction in property derived from specified unlawful activity)]."

73.     This Court has authority to issue a seizure warrant pursuant to Title 18, United States Code, Section 981(b)(2), which states that "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  This Court also has authority to issue the requested seizure warrant pursuant to Title 21, United States Code, Section 853(f), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), which authorizes "the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant."

74.     Pursuant to Title 18, United States Code, Section 981(b), the Court may issue a seizure warrant in any district in which a forfeiture action may be filed and the seizure warrant may be executed in any district in which the property is found.  *See also* Fed. R. Crim. P.41(b) (magistrate judge has authority to issue a warrant to seize property "located in the district" and "in any district where activities related to the crime may have occurred[, to] issue a warrant for property that is located outside the jurisdiction of any state or district….").  Title 28, United States Code, Section 1355, provides that a forfeiture action may be brought in the district court for the

district in which any of the acts or omissions giving rise to the forfeiture occurred or in certain other districts, including the district where the property is found.

75. A restraining order, pursuant to Title 21, United States Code, Section 853(e), will not be sufficient to preserve the assets in question given the ease with which funds may move out of the accounts via wire transfer, electronic funds transfer, or otherwise, and despite best intentions, financial institutions cannot guarantee that money restrained, but not seized, will be available for forfeiture at a later time.

## CONCLUSION

76. Based on the information described above, I have probable cause to believe that McIntyre has committed wire fraud and money laundering.

77. Further, I have probable cause to believe that up to $209,500 in the Brattleboro 4614 Account constitutes or is derived from proceeds traceable to wire fraud and that the funds are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and also probable cause that the Property is property involved in money laundering or traceable to such property and is subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C) and Section 982(a)(1), and Title 28, United States Code, Section 2461(c).

Sworn to under the pains and penalties of perjury.

Respectfully submitted,

_____
Adam Boynton, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 3rd day of May, 2021.

_____
Honorable Judith G. Dein
United States Magistrate Judge